SUNDAR, J.T.C.
This opinion partially decides the parties’ respective summary judgment motions. Plaintiff (“Turnpike”) contends that defendant’s imposition of roll-back taxes on properties the Turnpike acquired for purposes of mitigating certain wetlands it was impacting due to a widening project is improper as a matter of law. It argues that it meets all the three requirements of N.J.S.A. 54:4-23.8 for a roll-back tax exemption because (i) it is a “local government unit,” (ii) which acquired property, (iii) for “conservation and recreation” purposes.
Defendant (“Township”) contends that the Turnpike does not fall within the language and intent of the statutory exemption from roll-back taxes because it is not a “local government unit” as defined by that statute. It also argues that the exemption should be guided by the purposes of the implementing legislation, the Garden State Preservation Trust Act (“GSPTA”), which does not extend the beneficial provision to lands acquired for mitigation purposes.
The court preliminarily finds that the Turnpike is not a “local government unit.” Therefore, as to this issue, both parties’ summary judgment motions are denied. However, since the roll-back *145 exemption is also extended to the State, the court directs the parties to brief the issue whether the Turnpike, which is undisput-edly an instrumentality and authority of the State, falls within the statute permitting a roll-back exemption. Since the parties have briefed and argued the issue of the third prong of the roll-back exemption statute, namely, whether Turnpike acquired the properties for purposes of “conservation and recreation,” this issue need not be addressed in the supplementing briefing the parties are now being directed to provide. The court will issue its final decision after consideration of these two issues, and subsequent to the parties’ supplemental briefing.

FACTS

The Turnpike is established in the New Jersey Department of Transportation (“NJDOT”), as a “body corporate and politic with corporate succession.” N.J.S.A. 27:23-3. It is “an instrumentality, exercising public and essential governmental functions.” Its primary purposes is “to provide for the acquisition and construction of modern express highways” and in this regard “to acquire, construct, maintain, improve, manage, repair and operate transportation projects.” N.J.S.A. 27:23-1. Those functions are “deemed ... to be an essential governmental function of the State.” N.J.S.A. 27:23-3.
The Turnpike is currently involved in a project to widen and reconfigure a portion of the highway from interchange 6 to interchange 9 (“Project”). Because the Project would impact certain freshwater wetlands adjacent to the Turnpike and in the vicinity of the interchanges, the Turnpike obtained a permit from the New Jersey Department of Environmental Protection (“NJDEP”) to be allowed to do so. The NJDEP approved a five-year permit in April 2009 pursuant to the Freshwater Wetlands Protection Act allowing the Turnpike to disturb about 119 acres of wetlands, State open waters, ditches, and shading impacts to regulated watercourses.
One of the several conditions of the permit was that the Turnpike mitigate for the permanent and temporary impact to certain wetlands and forested riparian zones. As part of the *146 several conditions of wetlands mitigation, the Turnpike was required to relocate certain wetland ditches/swales and replace the same. The permit also identified several potential mitigation sites in this regard. One such site was the “Brookland Mitigation Site” located in the Township, which would “enhance 81.34 acres of wetlands and preserve a 271-acre wetland-denominated forested complex” and would mitigate “some portion of riparian zone ... impacts.” The permit further noted that the Project would impact about 93 acres of wetland/transition areas which were of a “vernal habitat” as to which the NJDEP required mitigation either by purchase of mitigation “credits” or by “on-site vernal habitat creation or restoration project.”
Another ten-year permit was issued by the NJDEP in April 2010 for the Project’s impact on flood hazard areas. It authorized further temporary and permanent disturbances to additional areas, which were grassed, herbaceous, and forested riparian zones. It also modified the 2009 permit to allow for temporary and permanent impacts to palustrine scrub-shrub, forested, and emergent freshwater wetlands. All conditions of the 2009 permit continued to be effective.
The “Brookland Mitigation Site” identified in the 2009 permit referred to lands owned by Brookland Company, G.P. This company owned contiguous Lots 6, 7,10,11 in Block 6, and Lots 1 and 2 in Block 7 (“Subject”) measuring approximately 397.47 acres.
In April 2009, the Turnpike’s real estate appraiser prepared an appraisal report for purposes of the Turnpike’s proposed acquisition of the Subject. The report noted that the Subject was “vacant residential land” a majority of which was located in the Rural Residential-Farmland Preservation District zone which permitted development of single-family homes on six-acre lots. The area along the boundary lines was located in the Flood Hazard/ Conservation District which had restrictive development. Per the report, most of the Subject had “areas of woodlands [and] cleared grassland areas” with “mostly level to slightly varying topography” but was “encumbered with a variety of wetlands and wetland buffers.” 115.9 acres of the Subject was uplands but with limited *147 access, and 27.36 acres (Block 6, Lot 11) of uplands was suitable for development (subject to potential mitigation of a section of wetlands dividing the uplands). The report concluded that the highest and best use of the Subject was for (i) potential subdivision of the 27 ± acres into a four-lot residential area, and (ii) “active or passive recreational purposes” on the remaining 370.11 acres of wetlands and wetland buffers. Based on such use, the appraiser opined a market value of $2.45 million ($600,000 for a proposed four-lot residential subdivision and $1.85 million for 370.11 acres of wetlands).
On June 30, 2009, the Turnpike approved acquisition of the Subject to satisfy a portion of its mitigation obligations. The minutes of the meeting in this regard noted that the Subject comprising of vacant parcels totaling 397.47 acres, as well as two more parcels owned by two other owners (Block 6, Lot 8 and Lot 9 measuring 8.37 acres and 7.85 acres respectively) were identified “as acceptable for mitigation purposes” by the Turnpike’s environmental consultant. The minutes also noted that none of these parcels (including the Subject) were “designated as ‘Preserved Farmland’ ” under the “Agriculture Development and Retention Act, N.J.S.A. 4:1C-11 et seq.” Nor were they “designated or encumbered as Green Acres properties” under “N.J.S.A. 13:1D-52 et seq.”
Thereafter, the Turnpike offered to donate the “Brookland Wetland Preservation Site” to the NJDEP as “appropriate compensation” for its wetlands and riparian mitigation obligations. An August 27, 2009 letter from the NJDEP issued to the New Jersey Wetlands Mitigation Council noted that the proposed donation of the Subject and Block 6, Lots 8 and 9 (not owned by Brookland Company), totaling 258 acres of which 146.5 acres were wetlands and 111.5 acres were upland, was “a part of a larger wetland mitigation proposal that includes the purchase of wetland mitigation bank credits and the creation and enhancement of wetlands.” The NJDEP approved the proposed donation because the properties met the requirements of the applicable environmental regulations for conservation/preservation of wetlands under N.J.A.C. 7:7A-15.22.
*148 Consequently, on January 11, 2010, the Turnpike purchased the Subject from Brookland Company for $4,000,000.00.[1] The purchase deed noted that the “conveyance” was made “in lieu of condemnation.” The deed was recorded February 23, 2010 in Middlesex County Clerk’s Office. No realty transfer tax was paid on grounds the transfer was made to the Turnpike, an “instrumentality of the State.”
For tax year 2010, the Subject was assessed as farmland qualified pursuant to the Farmland Assessment Act of 1964 (the “Act”). In response to the Township’s interrogatories requesting information on the application for farmland assessment and details of agricultural, horticultural, or recreational activities conducted on the Subject, the Turnpike stated that qualification for farmland assessment was “not at issue;” any details of the activities on the Subject prior to its acquisition was within the knowledge of Brookland Company; nothing was done by the Turnpike on the Subject after its acquisition since it was purchased for mitigation purposes; and that “based upon information available in the public domain, it appear[ed]” that the Subject was “unimproved during” 2010 and the prior two tax years. It responded that it did not receive any income from sale of horticultural or agricultural products, or any payments from the soil conservation plan in *149 2008-2010. It responded “n/a” to questions regarding the Subject’s use for tree production/woodland management. Thus, it is undisputed that the Subject was not used for agricultural or horticultural or tree production/woodland management purposes after the Turnpike’s purchased it in 2010.
Although the parties do not dispute the Subject’s prior assessments under the Act, there is no information on why the Subject qualified for the same during 2008 and 2009. The April 2009 appraisal report appears to indicate that for 2009, the Subject was farmland assessed, the assessed values being as follows:
Block_Lot_Assessment
6 6 $66,500
7 $ 700
10 $ 1,400
_11_$82,700
7 1 $59,300
2 $20,200
Following the Turnpike’s purchase of the Subject, the Township’s assessor filed a complaint with the Middlesex County Board of Taxation (“County Board”) to impose roll-back taxes on the Subject for tax years 2008-2010.[2]
On September 15, 2011, after a hearing, the County Board issued six judgments ordering roll-back assessments as follows:
*150 Block Lot Tax Year Assessment
2010 S2,629,400
2009 S2,464,100
2008 S2,842,600
2010 $ 45,600
2009 $ 42,700
2011 $ 49,200
10 2010 $ 100,700
2009 $ 94,700
2008 $ 108,800
2010 $3,733,700
2009 $3,499,800
2008 $4.035.600
2010 $2,046,100
2009 $1,917,100
2008 $2,212,600
2010 $ 695,500
2009 $ 651,700
2008 $ 752.100
The Turnpike filed a timely complaint with this court appealing the County Board’s judgments. The only count being decided in this motion is whether the Subject is exempt from the roll-back pursuant to N.J.S.A. 54:4-23.8.

FINDINGS

{A) Appropriateness of Summary Judgment

Summary judgment will be granted “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(e); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995).
The Turnpike here only maintains that a change in title or ownership does not trigger roll-back if the “new use is exempt.” It argues that because it is a “local government unit” which acquired the Subject for conservation purpose, which purpose is the “new use,” it is not liable for roll-back taxes because that “new *151 use” is statutorily exempt. Therefore, the only issue presented by the parties here is whether the Turnpike satisfies the criteria in N.J.S.A. 54:4-23.8 to qualify for a roll-back exemption. This requires an interpretation of the statute therefore summary judgment is appropriate. However, as noted earlier, the court is only providing a decision on one aspect of the statute, namely, whether the Turnpike is a “local government unit.” This being a legal issue can still be decided by way of summary judgment.

(B) Imposition of Roll-back Taxes

The imposition of roll-back taxes is authorized by our Constitution. Thus, “when land which has been valued” under the Act “is applied to a use other than for agriculture or horticulture” then it “shall be subject to additional taxes ... in the current year and in such of the tax years immediately preceding, not in excess of 2 such years in which the land was valued” under the Act. N.J. Const. Art. VIII, § I, ¶ 1.
The enabling statute, N.J.S.A. 54:4-23.8, reiterates the above mandate and provides that land “which is in agricultural or horticultural use and is being valued, assessed and taxed under the” Act, will be subject to roll-back taxes if it “is applied to a use other than agricultural or horticultural.” Roll-back taxes apply “when a change in use of the land occurs, but not” due to a change in ownership, provided the new owner “continues the land in agricultural or horticultural use” pursuant to the Act. N.J.S.A. 54:4-23.15; N.J.A.C. 18:15-7.2(a).

(C) Exemption from Roll-Back Taxes

In 1999, the GSPTA, L. 1999, c. 152, N.J.S.A. 13:8C-1 et seq. enacted detailed legislation intended to promote preservation and conservation of lands. The law was enacted in response to a 1998 constitutional amendment which authorized the dedication of $98 million per year and issuance of bonds of $1 billion, to fund the needs for “open space preservation, farmland preservation, recreation and park development, and historic preservation.” Statement to Sen. 9 (May 10, 1999). The law created a Trust to issue *152 the bonds, and monitor/allocate the funds to be complied with by the Garden State Preservation Trust (“Trust”), the NJDEP, the State Agricultural Development Committee (“SADC”) and the New Jersey Historic Trust (“NJHT”). Ibid.
Thus, the GSPTA funds the costs (some or all) of the “projects undertaken” by, among others, the NJDEP, or by “grant or loan recipients.” N.J.S.A. 13:8C-5(a). A “project” included “all things deemed necessary or useful and convenient in connection with the acquisition or development of lands for recreation and conservation purposes, the acquisition of development easements or fee simple titles to farmland, or the preservation of historic properties, as the case may be.” N.J.S.A. 13:8C-3.
For the GSPTA to apply to lands “acquired or developed by a local government unit ... for recreation and conservation purposes,” either with State funds, or previously acquired or developed without State funds, the law requires public hearings and approval process before the unit can sell or change the use of such lands. See generally N.J.S.A. 13:8C-32(a); 8C-33; 8C-35. Such hearing and approval process also applies if the local government unit conveys such of its lands to the State or’ another local government unit. N.J.S.A. 13:80-34. The GSPTA requires the NJDEP to maintain and provide a list of projects recommended for funding for acquisition or development of lands for recreation and conservation purposes. N.J.S.A. 13:8C-23(a)(1). Those recommendations are based on applications received from local government units. The Trust must biennially, after consulting the NJDEP, the SADC and the NJHT, report to the Legislature the total acreage for the entire State and for each county and municipality the “lands acquired for recreation and conversation purposes and of farmland preserved for farmland preservation purposes.” N.J.S.A. 13:80-25.
So that the “municipalities may not suffer a loss of taxes” when lands are acquired by the State or a qualifying tax-exempt nonprofit entity “in fee simple for recreation and conservation purposes” under the GSPTA, the State or that entity must “make annual payments in lieu of taxes.” N.J.S.A. 13:8C-29(a); 13:80- *153 30(a). “[L]ands owned in fee simple by the State for recreation and conservation purposes” refer to “State parks and forests ... State wildlife management areas, and any other lands owned in fee simple by the State and administered by” the NJDEP “for recreation and conservation purposes.” N.J.S.A. 13:8C-29(e); 13:8C-30(e). The payment in lieu of taxes provisions do not include or reference a local government unit.
The provision claimed to be applicable here which provides for an exemption from the roll-back taxes is as follows:
In the event that land acquired by the State, a local government unit, a qualifying tax exempt nonprofit organization, or the Palisades Interstate Park Commission for recreation and conservation purposes was assessed at an agricultural and horticultural use valuation in accordance with provisions of the “Farmland Assessment Act of 1964,” P.L. 1964, c. 48 (C. 64:4-23.1 et seq.) at the time of its acquisition by the State, local government unit, qualifying tax exempt nonprofit organization, or the Palisades Interstate Park Commission, no roll-back tax pursuant to section 8 of P.L. 1964, c. 48 (C. 54:4-23.8) shall be imposed as to this land nor shall this rollback tax be applicable in determining the annual payments to be made pursuant to subsection a. of this section by the State to the municipality in which this land is located.
[N.J.S.A. 13:8C-29(b) ]
In conjunction with and because of the above provision, the same legislation also amended the roll-back statute under the Act. Thus, N.J.S.A. 54:4-23.8 was amended to exempt roll-back taxes upon lands being assessed under the Act if it is “acquired by ... a State [or] local government unit ... for recreation and conservation purposes.” See also N.J.A.C. 18:15-7.2(b) (same). Because N.J.S.A. 54:4-23.8 was amended in conjunction with and because of the GSPTA, it adopts and incorporates by reference, the GSPTA’s definitions of the terms “acquired,” “local government unit,” and “recreation and conservation purposes” by noting that these terms “mean the same as [they] are defined” in N.J.S.A. 13:8C-3. See N.J.S.A. 54:4-23.8.
The GSPTA’s definitions for “acquired,” “local government unit,” and “recreation and conservation purposes” are as follows:
(i) “acquire” or “acquisition" means “the obtaining of a fee simple or lesser interest in land, ... by purchase, ... gift, donation, ..." N.J.S.A. 13:8C-3.
(ii) “ ‘local government unit’ means a county, municipality, or other political subdivision of the State, or any agency, authority, or other entity thereof; except, with respect to the acquisition and development of lands for recreation *154 and conservation purposes, “local government unit” means a county, municipality, or other political subdivision of the State, or any agency, authority, or other entity thereof the primary purpose of which is to administer, protect, acquire, develop, or maintain lands for recreation and conservation purposes.” Ibid.
(in) “Recreation and conservation purposes” means “the use of lands for beaches, biological or ecological study, boating, camping, fishing, forests, greenways, hunting, natural areas, parks, playgrounds, protecting historic properties, water reserves, watershed protection, wildlife preserves, active sports, or a similar use for either public outdoor recreation or conservation of natural resources, or both.”

[Ibid.]

The parties do not dispute that the Turnpike acquired the Subject. The parties are at odds as to (i) whether the clause in the definition of “local government unit” applies to the Turnpike; and (ii) whether the Turnpike’s acquisition of the Subject for purposes of mitigation under the NJDEP laws qualifies as an acquisition “for recreation and conservation purposes” under the GSPTA. The court here only decides the first of the disputed issues.

(D) Is the Turnpike a “Local Government Unit”

The Turnpike claims that it fits within the generic definition of a “local government unit” contained in the first part of N.J.S.A. 13:8C-3, i.e., in the language before the clarifying clause, as an “authority or other entity of’ the State. It maintains that the clause in the definition applies to a “separate category” of entities, which are those bodies that both acquire and develop land. The Turnpike notes that it only acquired the Subject, therefore the clause does not apply, which means that an analysis of the “primary purpose” tests in the clause is unnecessary. The Turnpike points out that its construction is reasonable because N.J.S.A. 54:4-23.8, the statute at issue here, requires only an acquisition of the lands to qualify for roll-back exemption.
The Township argues that the definition of a “local government unit” does not include “State agencies, authorities and other similar entities from” the exemption “unless the primary purpose of the agency or authority” is one of the listed activities in the definition. It maintains that the Turnpike is “concededly ex- *155 elude[d]” from the definition of a “local government unit” because its primary purpose is to build/maintain roads.
A review of the legislative history indicates that the law “would exempt the State, local government units, and nonprofit organizations from the payment of any farmland assessment roll-back tax in connection with any acquisition of land for open space or farmland preservation purposes.” See Statement to S. 9, supra. Further, the clause beginning with “except” was intended to “clarify the definition of ‘local government unit.’ ” See Assembly Agricultural and Natural Resources Comm., Statement to Assembly No. 100000 (May 20, 1999). There is no other explanation as to why such a clarification was required.
Both parties are erroneous in their respective interpretations.[3] The definition of a “local government unit” indicates that it does not include an instrumentality or authority of the State. Rather, the words “agency, authority, or other entity” are qualified by the term “thereof.” The word “thereof’ means that an “agency, authority or other entity” should relate or belong to, or is affiliated with the words preceding them. See Black’s Law Dictionary (9th ed. 2009) (defining “thereof’ as “of that, it, or them,” for instance, “although the disease is spreading rapidly, the cause thereof is unknown”). This means that here, the word “thereof’ *156 pertains to or qualifies the word preceding that words, which is “a county, municipality, or other political subdivision of the State.” In other words, a local government unit includes (i) an agency or authority or other entity of a county; or, (ii) an agency or authority or other entity of a municipality; or, (iii) an agency or authority or other entity of a political subdivision.
The Turnpike is established as a “body corporate and politic with corporate succession.” N.J.S.A. 27:23-3. Its implementing statute treats is as an instrumentality of the State. It is recognized as “a duly created governmental agency of the State.” Mayor of Elizabeth v. New Jersey Turnpike Auth. 7 N.J.Super. 540, 544, 72 A.2d 399 (Ch. Div.1950).
Thus, the Turnpike is not an agency or authority or other entity of a “county.”* **[4] Nor is it an agency or authority or other entity of a “municipality.”[5] Neither is it an agency or authority or other entity of a “political subdivision of the State” because it is “in” the NJDOT. See N.J.S.A. 27:23-3 (“[t]here is hereby established in the State Department of Transportation a body corporate and politic, with corporate succession, to be known as the New Jersey Turnpike Turnpike”). The NJDOT is not a “political subdivision” of the State but is a State agency.[6] See N.J.S.A. 27:1A-2 (the NJDOT is “established in the Executive Branch of the State Government” as “a principal department”).
*157 Thus, regardless of the clause within the definition, the court finds that the Turnpike is not a “local government unit” as that term is defined in the GSPTA.

CONCLUSION

The parties moved for summary judgment on the Turnpike’s ability to satisfy the three-prong criteria for a roll-back exemption, namely, whether (i) the Turnpike is a “local government unit,” (ii) which acquired property, (iii) for “conservation and recreation” purposes. It is undisputed that the Turnpike acquired the Subject. Both parties agreed that the Turnpike as an authority of the State fits within the initial portion of the definition of a “local government unit” however, the court has decided that the Turnpike, an authority of the State, is not a “local government unit” even under the first portion of the definitional section of that term. Therefore, as to this issue, the court denies both parties’ summary judgment motions.
However, the GSPTA and the Act provide a roll-back exemption to the State. Therefore, and before deciding the last criterion of the roll-back exemption requirement, namely, that the acquisition be for “conservation and recreation” purposes, the court directs the parties to brief the issue whether the Turnpike qualifies for roll-back exemption as the “State” under the GSPTA, and thus, under the Act.
The Turnpike should file a supplemental brief in this regard no later than March 31, 2014. The Township’s reply brief will be due April 18, 2014. The parties need not re-brief the issue of whether Turnpike’s acquisition of the Subject qualifies for exemption on grounds of “conservation and recreation” purposes. Oral argument on the supplemental briefs will be granted only if requested by the parties.
Upon consideration of the supplemental briefs, the court will thereafter issue its final decision.

The sale-purchase deed listed the Subject as including Block 6, Lot 11.01. However, the various other documents submitted in support of the motion including the County Board judgments list the Lot as 11. Neither party raised any issue as to this numbering therefore, the court will not consider this as a material fact in genuine dispute preventing consideration of a summary judgment.
The parties also included information about another Lot owned by Brook-land Company identified as Lot 40, in Block 6 totaling about 11.775 acres over which the owner had created a conservation easement in favor of the Township by deed of March 27, 1986. The easement intended to preserve the land in its natural condition so it prohibited removal and destruction of the natural resources/condition and barred construction of any improvements. Though intended for public enjoyment, the easement did not permit public use or access. The conservation easement was binding upon the owner and its successors. This land was not included in the deed involving the purchase of the Subject by the Turnpike. The April 2009 real estate appraisal prepared for the Turnpike did not identify this or any easements when valuing the Subject for its acquisition.

 The discrepancy (if any) in the total acreage listed as a proposed donation in the NJDEP's August 27, 2009 letter (258 acres) versus the Subject's acreage of 397.47 (as stated in the Turnpike's minutes and the April 2009 appraisal report) is not relevant for purposes of this motion because there is no dispute that the Subject was donated to the NJDEP for mitigation, and that the Township imposed roll-back taxes upon the Subject.

 It should be noted that the NJDEP required the Turnpike to develop and create/restore wetlands and vernal habitat as part of the mitigation obligations. There is nothing to indicate that the Subject was not to be used for any of these purposes. Therefore, the Turnpike’s argument that it did not, or was not required to, "develop" the Subject is questionable.
In this connection, the Township claimed that the Turnpike was involved in development of the Subject as evident from a printout of the Turnpike’s website of (i) a list of "Awarded Contracts," and (ii) a summary of "Construction Updates" which showed that the Turnpike had awarded a contract to a third-party sometime in August 2012 in connection with the "Brookland Mitigation Site." The Turnpike objected to the use of the document on grounds it was "not part of the motion record" because it was an electronic excerpt, when what is required is a complete certified copy of the actual contract. While the court can take judicial notice of a publicly bid and awarded contract by a public entity, it will not take judicial notice of, or rely upon, the contract description or the "construction updates" to the same since they are not legally cognizable without compliance with evidentiary rules.

 See generally Clark v. Degan, 163 N.J.Super. 344, 366, 394 A.2d 914 (Law Div.1977) ("[a] county is a creature and subdivision of the State, constituted to perform certain functions of State Government”), modified on other grounds, 83 N.J. 393, 416 A.2d 816 (1980).

 See N.J.S.A. 1:1-2 (defining "municipality" as including "cities, towns, townships, villages and boroughs, and any municipality governed by a board of commissioners or an improvement commission”).

 While there is no assigned meaning to “political subdivision" in statutes generally "applicable to various governmental entities at the state, county and municipal level, the Legislature previously has used the term ... ‘political subdivision’ to refer to a school district and those local units.” New Jersey Ass’n of School Business Officials v. Davy, 409 N.J.Super. 467, 484, 978 A.2d 295 (App.Div.2009).